**This order is SIGNED.**

**Dated: June 1, 2020**

_/s/ J T Marker_
**JOEL T. MARKER**
**U.S. Bankruptcy Judge**



# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF UTAH

| In re:<br><br>COURTNEY ANNE OLSEN,<br><br>Debtor. | Bankruptcy Case No. 20-20087<br><br>Chapter 7<br><br>Hon. Joel T. Marker |
|---|---|

## MEMORANDUM DECISION

The Debtor in this chapter 7 case and her spouse filed a series of failed bankruptcy cases with the facially apparent purpose of stalling a foreclosure sale of their house. The Chapter 7 Trustee was aware of this history and believed that there might be equity in the house for the payment of creditors, but he ultimately dropped the matter and allowed the case to be dismissed under § 521(i) of the Bankruptcy Code. Just six days later, he began the process of trying to undo the dismissal, and the Court issues the following memorandum decision to explain why the Trustee's motion to vacate the dismissal order is denied.[1]

---

[1] This memorandum decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1), made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c). Any findings of fact herein are also deemed to be

## I. BACKGROUND[2]

Courtney and Matthew Olsen owned a house at 3522 West Lillehammer Circle in Salt Lake City. On November 6, 2018, Mrs. Olsen filed a chapter 13 case (#18-28328) that was promptly dismissed under § 521(i) for failure to file certain required bankruptcy documents.[3] Less than four months later, she filed a second chapter 13 case (#19-22597) that was even more promptly dismissed for failure to pay the filing fee.

Had she filed a third case within a year of the first case being dismissed, there would have been no automatic stay as to any creditors under § 362(c)(4)—so, as this Court has seen many times before, her husband filed his own chapter 13 case on July 2, 2019 (#19-24839). And after that case was dismissed for failure to pay the filing fee, he filed a second chapter 13 case on September 24, 2019 (#19-27041), which was also dismissed for failure to pay the filing fee.

None of these tag-teamed cases lasted for longer than two months, and three of the four cases lasted only a few weeks. All of them had unpaid fees and various unfiled documents, and although the first-position mortgage creditor never filed a proof of claim in any of the cases, Mr. Olsen himself estimated an arrearage of $21,000 in case #19-24839.[4] So by the time that Mrs. Olsen filed this chapter 7 case (#20-20087) on January

---

conclusions of law, and any conclusions of law herein are also deemed to be findings of fact, and they shall be equally binding as both.

[2] For purposes of this memorandum decision, the Court will assume *arguendo* that the representations of Trustee's counsel at the May 13 hearing have factual support in the record, and all quoted statements come directly from the recording of the hearing. All other facts are taken from documents filed with this Court or the Utah state court.

[3] All statutory references are to title 11 of the United States Code unless otherwise specified.

[4] Docket #2, Chapter 13 Plan. The U.S. Department of Housing and Urban Development (HUD) also filed a $5,145.15 secured claim in case #19-24839 on July 15, 2019 as proof of claim #3-1, and in case #19-27041 on September 30, 2019 as proof of claim #2-1, despite not being listed as a creditor in either case.

7, 2020 without the assistance of counsel, it was apparent that she had no intention of actually prosecuting this case either.[5]

She filed none of the items required by § 521(a)(1)(A) and (B) and paid just $100 toward the $335 filing fee to buy herself some time before this case was dismissed like all the others. But the first-position mortgage creditor had apparently had enough of the Olsens' shenanigans, and on January 16, Bank of America filed a Motion for *In Rem* Relief from the Automatic Stay under § 362(d)(4) requesting stay relief on the house that would be unaffected by any future bankruptcy case.[6] The motion discussed the Olsens' history of well-timed bankruptcy filings, indicated that no mortgage payments had been made since at least April 2018, and alleged two junior liens on the property in favor of Wells Fargo and HUD along with the county assessor's value for 2019 that resulted in substantial negative equity.

Mrs. Olsen did not respond, but the Chapter 7 Trustee filed a detailed objection on January 21 that not only requested time to "investigate and administer" the property, but also requested that the case not be dismissed during this process.[7] In his objection, the Trustee clearly stated his knowledge of the Olsens' bankruptcy history—with each of their five cases being filed on the eve of foreclosure—and his belief that the cases were filed "in bad faith only to stop the foreclosure of the property due to the failure to pay the mortgage payments."[8] The Trustee also expressed his understanding that because of Mrs. Olsen's failure to file any required documents or pay the balance of the filing fee in this case, "it appears that there will be several causes for dismissal of the case[,] which dismissal would

---

[5] The Olsens were represented by counsel in all four of their prior cases.
[6] Docket #9.
[7] Docket #11.
[8] *Id.* at p. 4, ¶ 8.

3

perpetuate the debtor's and non-debtor spouse's repetitive and bad faith filings."[9] As such, the Trustee opposed any dismissal while he conducted his investigation, and he telegraphed his plans for pursuing and administering any non-exempt equity in the property. Notably, the Trustee never specifically mentioned the potential second-position lien in favor of Wells Fargo, but he did discuss paying off the acknowledged lien in favor of HUD.[10] He also suggested that the county assessor's valuation was understated and noted that "[i]n no case have the [Olsens] scheduled any creditor secured by the property besides Bank of America."[11]

Shortly after the objection was filed, the Trustee sought and obtained authorization to employ himself as counsel and to employ a real estate broker and agent to assist with the investigation and possible sale of the property. In addition to reviewing a title report—Trustee's counsel stated that "after reviewing the title report, we did have some uncertainty originally"[12]—the Trustee and/or his counsel discussed the matter with Bank of America's counsel and "local counsel for Wells Fargo," Mark Middlemas, at some point **before** February 12.[13] Mr. Middlemas allegedly told the Trustee that he "believed that the lien appeared to be valid, but he would look into it a little more and get back to" the Trustee.[14] And at some point **after** February 12, Mr. Middlemas called the Trustee back to indicate

---

[9] *Id.* at p. 4, ¶ 9.
[10] The only extremely oblique reference to other potentially secured debt was in ¶ 8, where the Trustee stated his intent to challenge the Olsens' homestead claims "[d]epending on the outcome of the investigation of this case, including the value of the Lillehammer property and the amount of secured debt against the property . . . ." *Id.* at p. 3, ¶ 8.
[11] *Id.* at pp. 2-3, ¶ 4.
[12] Hearing at 10:54:50.
[13] Hearing at 10:44:26. Mr. Middlemas does periodically represent Wells Fargo in this Court, but neither he nor any other attorney has ever entered an appearance on behalf of Wells Fargo in the state court case or any of the Olsens' bankruptcy cases.
[14] Hearing at 10:45:52.

4

that he still had not received an answer from Wells Fargo and that "maybe there is a problem" after all.[15] Nevertheless, the Trustee withdrew his objection on February 12, stating on the docket: "No longer prosecuting objetion [sic] to motion to terminate stay or objetion [sic] to dismissal of case." Bank of America obtained *in rem* stay relief on February 13 with a waiver of the Rule 4001(a)(3) 14-day stay,[16] and the Trustee filed a motion to dismiss the case after Mrs. Olsen failed to attend the February 18 meeting of creditors, in which he again noted the Debtor's failure to file or provide various documents.[17]

One day later on February 19—the same day that the house was sold, according to the Submittal of Excess Sale Proceeds that commenced state court case #200901700—Mrs. Olsen filed another chapter 7 bankruptcy case (#20-20966) that was ultimately dismissed on March 10 for failure to pay the filing fee.[18] According to Trustee's counsel, the Trustee knew that the sale was going to take place on February 19, but he "was assuming" that any excess proceeds would go to Wells Fargo if its lien was actually valid, "either directly through the foreclosure process or that they would make a claim on the excess proceeds."[19] On February 25, the Court entered an Order of Dismissal for Failure to Comply with 11 U.S.C. § 521(a)(1) in this case, which provided that "[p]ursuant to 11 U.S.C. § 521(i), it is hereby ORDERED that Debtor Courtney Anne Olsen **has been** DISMISSED from the

---

[15] Hearing at 10:46:11.
[16] Docket #26.
[17] Docket #28.
[18] It is unclear from the state court docket whether and when Bank of America recorded its *in rem* stay relief order in accordance with § 362(d)(4), or what time the sale occurred on February 19 relative to Mrs. Olsen's bankruptcy filing, but those facts are not critical to resolution of the present motion.
[19] Hearing at 10:49:33.

above-captioned case for failure to comply with 11 U.S.C. § 521(a)(1)."[20] The Trustee filed a no-asset report on February 27.

On February 28, the Trustee received notice of the excess sale proceeds by email from counsel for the foreclosing creditor, which is the same day that the Submittal of Excess Sale Proceeds was filed commencing state court case #200901700. On March 2, just six days after the § 521(i) dismissal order had been entered, the Trustee filed a terse Motion to Reopen Case and Appoint Trustee which alleged that he had "received notice of the submission of excess sale [sic] from the sale of real property" on February 28 and requested that the case be reopened "so that a Trustee may be appointed these [sic] evaluate these excess sales [sic] proceeds, and to administer these proceeds for the benefit of the bankruptcy estate."[21] The case, however, had not yet been closed, and the Trustee had not yet been discharged from his duties. The Trustee cited no authority supporting the requested relief. And because no "list of creditors" had ever been filed as required by § 521(a)(1)(A), and Mrs. Olsen was potentially no longer in the property, the motion and notice of opportunity for hearing were effectively served on no one except counsel for Bank of America.[22]

Given the Court's own substantive and procedural concerns, and despite the lack of any filed objection, the Court rescheduled and then activated the reserved hearing on the Trustee's Motion to Reopen. But in the meantime, the Trustee withdrew the inapposite

---

[20] Docket #29 (emphasis added).
[21] Docket #32, p. 2, ¶¶ 3-4.
[22] The Trustee also filed a Precautionary Motion to Extend All Deadlines on March 19 (docket #35) requesting that "all deadlines in the case, including the deadline for filing objections to exemptions and the deadline for filing complaints concerning the debtor's discharge be continued without date pending the disposition of the dismissal of this case and the Trustee's pending motion to either reopen the case or vacate the dismissal." Given the Court's denial of the Trustee's substantive motion, this separate precautionary motion is moot.

6

Motion to Reopen and replaced it with a Motion to Vacate Dismissal and Appoint Trustee, which is the operative motion before the Court.[23] In the motion, the Trustee indicates that he withdrew his objection to stay relief and dismissal after discussions with counsel for Bank of America and review of a title report showing a substantial junior lien in favor of Wells Fargo that would have consumed any equity in the property—there is no mention of any conversations with Mr. Middlemas or anyone else with Wells Fargo—but he is now unclear on the status of any Wells Fargo lien, and Wells Fargo has not yet appointed local counsel or otherwise made a claim in the state court case against the excess proceeds. As such, he relies solely on § 105(a) and Rule 60(b)(2) to undo the dismissal, arguing that "he has obtained new information regarding the Wells Fargo lien that was not available at the time the case was dismissed" and that the sale proceeds are "a newly discovered asset."[24] Nobody responded to the motion. And now that the deadlines for petitions and counter-petitions in the state court case have expired, the remaining parties have stipulated to the release of certain funds to HUD and an assignee of Mr. Olsen. As such, the only remaining dispute in the state court case is between the Trustee and Mrs. Olsen's assignee regarding the $60,819.97 balance of the excess sale proceeds.

## II. DISCUSSION

Since § 521(i) was added to the Bankruptcy Code in 2005, courts have spilled a lot of digital ink trying to determine what an "automatic dismissal" is and how it works in

---

[23] Docket #37. The Motion to Vacate Dismissal and the accompanying Notice of Hearing (docket #38) were served to Mrs. Olsen by email and to most of the creditors listed in the chapter 7 case that Mrs. Olsen filed on February 19 (#20-20966), as well as the chapter 7 trustee of that case. But as the Court indicated to Trustee's counsel at the hearing, the address used for Chase Bank is different from the one listed in case #20-20966, and Chrysler Financial was not served at all.

[24] Docket #37, pp. 1 (Introduction) and 3 (¶ 16).

7

practice, and this Court does not need to join the 15-year-old fray in this case.[25] It is sufficient to say that on its face, § 521(i) is a very unforgiving statute. Specifically, § 521(i)(1) provides that "[s]ubject to paragraphs (2) and (4) and notwithstanding section 707(a), if an individual debtor in a voluntary case under chapter 7 or 13 fails to file all of the information required under subsection (a)(1) within 45 days after the date of the filing of the petition, the case shall be automatically dismissed effective on the 46th day after the date of the filing of the petition." Despite some difficulties in the statutory text, this Court finds the language to be relatively straightforward—although normally dismissal of a chapter 7 case requires notice and a hearing and a showing of cause under § 707(a), § 521(i)(1) dispenses with those requirements and mandates dismissal if a debtor fails to file the information required by § 521(a)(1) within 45 days of the petition date.

Some courts have found the idea of a truly "automatic" dismissal—essentially a metaphysical event that occurs without court intervention and whether anyone knows about it or not—to be anathema to the normal functioning of any court and at odds with the language of § 521(i)(2), which provides that "[s]ubject to paragraph (4) and with respect to a case described in paragraph (1), any party in interest may request the court to enter an order dismissing the case. If requested, the court shall enter an order of dismissal not later than 7 days after such request." But in this Court's view, § 521(i)(2) merely allows for a "comfort order" to be entered if a court does not otherwise dispose of an automatically dismissed case on its own. This Court implements § 521(i)(1) by issuing early deficiency notices with clear warnings about the automatic dismissal deadline (as was done in this

---

[25] *See generally In re Marcott*, 545 B.R. 668 (Bankr. D.N.M. 2016) (discussing questions raised by § 521(i)); Mantas Valiunas, ANYTHING BUT AUTOMATIC: DISMISSAL UNDER § 521, 28 Emory Bankr. Dev. J. 231 (2011) (same).

case on January 8), carefully tracking the 45-day deadline, and promptly entering a dismissal order which indicates that the case **has been** dismissed under § 521(i) for failure to comply with § 521(a)(1).[26]

Finally, § 521(i)(3) and (4) provide for limited exceptions to automatic dismissal. Under § 521(i)(3), a debtor may request an extension of time for filing the required information, up to 45 additional days, "if the court finds justification for extending the period for the filing." Under § 521(i)(4), on motion of a trustee, a court "may decline to dismiss the case if the court finds that the debtor attempted in good faith to file all the information required by subsection (a)(1)(B)(iv) and that the best interests of creditors would be served by administration of the case." Neither of those things occurred in this case. As such, the case was "automatically" and appropriately dismissed under § 521(i).

Some courts, however, have held that abusive debtors cannot use § 521(i) as a "get-out-of-bankruptcy-free card" if they no longer like how their cases are progressing, relying on the language of § 521(a)(1)(B) to "order[] otherwise" even **after** the 45th day has passed.[27] This Court invokes aspects of that concept in Standing Order 12-002 (establishing a procedure for providing § 521(a)(1)(B)(iv) payment advices or other evidence of payment to the case trustee); Local Rule 1007-1(a)(1) (authorizing a case trustee to request that a case not be dismissed even if certain documents are not timely

---

[26] The Court's January 8 Deficiency Notice incorrectly states that the § 521(i)(1) deadline was Monday, February 24 rather than Friday, February 21. As such, the dismissal order was entered on February 25, when it should have been entered on February 24. This systemic calculation issue has since been corrected, and the discrepancy does not affect the Court's analysis.

[27] *See, e.g.*, *Segarra-Miranda v. Acosta-Rivera (In re Acosta-Rivera)*, 557 F.3d 8 (1st Cir. 2009); *Wirum v. Warren (In re Warren)*, 568 F.3d 1113 (9th Cir. 2009); *In re Amir*, Bankr. No. 08-13700, 2009 WL 1616670 (Bankr. N.D. Ohio Mar. 17, 2009), *aff'd*, 436 B.R. 1 (6th Cir. BAP 2010); *In re Thrower*, Bankr. No. 14-30265, 2014 WL 1873399 (Bankr. W.D.N.C. May 8, 2014); *In re Bliek*, 456 B.R. 241 (Bankr. D.S.C. 2011).

filed, subject to § 521(i)); and Local Rule 1007-1(a)(2) (deferring automatic dismissal if a motion is pending under §§ 109(g) or 362(d)(4)). And the Trustee effectively invoked the concept, without citing any specific authority, by opposing dismissal in his objection to Bank of America's *in rem* stay relief motion. The most glaring problem in this case is that the Debtor also failed to file the "list of creditors" required by § 521(a)(1)(A), which is specifically excepted from a court's ability to "order[] otherwise." The Trustee cited no authority, and the Court located no authority, that could be used to prevent—let alone undo—automatic dismissal under these circumstances.

In his Motion to Vacate Dismissal, the Trustee relies solely on § 105(a) and Rule 60(b)(2) to undo the automatic dismissal of this case. It is axiomatic that § 105(a) is not "a roving commission to do equity" and "does not empower courts to create remedies and rights in derogation of the Bankruptcy Code and Rules."[28] It is equally axiomatic that "Rule 60(b) relief is extraordinary and may only be granted in exceptional circumstances."[29] Moreover, Rule 60(b) can only provide relief "from a final judgment, order, or proceeding," not the statutory provisions of § 521(i) that were merely memorialized in the February 25 dismissal order.[30] So as a matter of law, Rule 60(b) relief is unavailable under these circumstances, and a general reliance on § 105(a) is insufficient—particularly when the Debtor has failed to comply with § 521(a)(1)(A), and despite the Trustee's belief in his ability to cull together a list of creditors from the Debtor's other bankruptcy cases.

---

[28] *Scrivner v. Mashburn (In re Scrivner)*, 535 F.3d 1258, 1265 (10th Cir. 2008); *see also Law v. Siegel*, 134 S.Ct. 1188 (2014).
[29] *Saggiani v. Strong*, 718 F. App'x 706, 709 (10th Cir. 2018).
[30] *In re Lugo*, 592 B.R. 843 (Bankr. N.D. Ind. 2018); *In re Wilkinson*, 346 B.R. 539, 545-46 (Bankr. D. Utah 2006); *In re Young*, Bankr. No. 06-80397, 2006 WL 3524482 (Bankr. S.D. Tex. Dec. 6, 2006); *In re Ott*, 343 B.R. 264 (Bankr. D. Colo. 2006).

But even if the Court reviewed the merits of the Trustee's positions, his equitable arguments, on this record, would be unavailing. In this case, the Trustee was well aware of the Olsens' bankruptcy filing history, and he opposed any dismissal of the case—automatic or otherwise—until he could investigate matters including but not limited to the Lillehammer Circle property. According to his counsel's representations, the Trustee made assumptions but had no certainty about the status of Wells Fargo's lien at the time he withdrew his objection to *in rem* stay relief and dismissal of the case, and he filed his own motion to dismiss the case after the Debtor failed to attend the meeting of creditors.[31] Trustee's counsel admitted that the situation could have possibly been figured out before the sale if he and the Trustee had done some more digging. The Trustee knew when the foreclosure sale was going to take place—which was before the case was automatically dismissed—but he apparently made no effort to see how the sale went. And even after the sale, he still got no solid answer from Wells Fargo about the status of its putative lien.

As for the Debtor and her husband, they appear to have abused the bankruptcy system for about 16 months to avoid foreclosure of their house, but their gambit ultimately failed. Both Bank of America and HUD have been paid in full (with Wells Fargo apparently making no claim to the remaining proceeds), the Debtor has not received a discharge of her other debts, and any remaining creditors are still able to pursue collection efforts and other remedies in the "real world" outside of bankruptcy. If the partial Schedules filed in case #20-20966 are accurate, the Debtor only has about $9,000 in general unsecured debt on top of a secured car loan, and she would be wise to use any excess sale

---

[31] Late in the hearing, Trustee's counsel used the word "assurances" to describe the content of the conversations with Mr. Middlemas and counsel for Bank of America (Hearing at 10:54:30), but that characterization is inconsistent with the substance of his earlier representations.

11

proceeds to pay off that debt herself. If she tries to file for bankruptcy yet again, she will have no stay in any case filed before February 25, 2021, and she will be very hard-pressed to demonstrate good faith by clear and convincing evidence that would justify imposing a stay. And the Debtor did not actively try to use § 521(i) as a sword in this case like the debtors in *Acosta-Rivera*, *Warren*, *Amir*, *Thrower*, and *Bliek*; rather, it is the Trustee trying to belatedly undo the effects of the statutory dismissal that he previously condoned.

Under these circumstances, the general scales of equity would not tip in the Trustee's favor under § 105(a). Likewise, extraordinary relief under Rule 60(b)(2) would be inappropriate because the excess sale proceeds would not be a "newly discovered asset," and the status of Wells Fargo's putative lien would not constitute "newly discovered evidence that, with reasonable diligence, could not have been discovered" before the case was automatically dismissed.[32] The Trustee knew enough that he could, and in this Court's view should, have looked into the matter further before walking away.

### III. CONCLUSION

Whatever equitable powers remain with a bankruptcy court, they cannot be invoked in derogation of the Bankruptcy Code, and they are not just an easy escape hatch for the consequences of intentional decisions. So while the Court appreciates the Trustee's desire to achieve what he perceives as a just result, there is no statutory or equitable basis in this particular case for undoing the automatic dismissal mandated by § 521(i). Accordingly, for the reasons stated above, the Trustee's Motion to Vacate Dismissal and Appoint Trustee is denied, and the Court will enter a separate order in accordance with this memorandum decision.

---

[32] The existence of Mrs. Olsen's subsequent chapter 7 case (#20-20966) also raises the question of whether any proceeds would be appropriately administered in this case or that case.

_____**ooo0ooo**_____

## CERTIFICATE OF SERVICE

Service of the foregoing **MEMORANDUM DECISION** shall be effected on all registered CM/ECF users in this case, on the Debtor at courtolsen@live.com, and on Spencer Macdonald at spencer@hwmlawfirm.com.